```
              UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF MISSISSIPPI
                      WESTERN DIVISION
```

**UNITED STATES OF AMERICA**

V.                               CRIMINAL NO. 5:08-CR-0011 DCB JCS

**ANDREW "ANDY" ELCHOS and**
**THEODORE "TED" ELCHOS**

### OPINION

This cause is before the Court on Appeal from United States Magistrate Judge Sumner's Ruling and Sentence filed pursuant to Rule 58(b)(2)(B) of the Federal Rules of Criminal Procedure. Having carefully considered said Appeal, the Government's response thereto, applicable statutory and case law, and being otherwise fully advised in the premises, the Court finds as follows:

### I. Facts and Procedural History

According to the record below, Andy Elchos, former game warden for the State of Mississippi, became the target of a Mississippi Department of Wildlife investigation after agent Gary Smith overheard a conversation between Tim Hodnett and Mark Necaise regarding illegal hunting activity. Tr. 10. Accordingly, working as a confidential informant in cooperation with Smith, Hodnett invited Andy Elchos to participate in a duck hunt during the special "teal season." Tr. 9. Prior to the hunt, Hodnett informed Andy Elchos in a phone conversation, which was recorded by Hodnett and submitted as evidence at trial, that he had illegally baited the pond where they would be hunting. Tr. 17. Further, on the night before the

hunt, Agent Smith testified that he visited the pond and took photographs of the probable location of the hunters and samples of the bait (soybeans) lying on the banks of the pond.[1] Tr. 19.

On September 17, 2006, Tim Hodnett and his son led Andy Elchos and his brother Ted Elchos on a duck hunt at a pond near his home in Sharkey County, Mississippi. According to Hodnett, it was apparent to the hunters that the pond was baited.[2] Hodnett testified at trial that the hunters killed twenty-eight (28) ducks during the morning hunt. Of those twenty-eight (28), Hodnett claimed that he and his son were responsible for killing seven (7) teal, and that the remaining ducks, which were comprised of teal, wood ducks, and shovelers, had been shot by Andy and Ted Elchos. Tr. 27. Immediately after the ducks had been retrieved from the pond, Hodnett surreptitiously took the birds to Smith, who was undercover nearby, so that Smith could take pictures of them. Tr. 76-77. Smith laid out the ducks on the tailgate of Hodnett's truck and photographed them before instructing Hodnett to return to the

---

[1] Smith also set up video surveillance equipment near the pond in an attempt to video the hunt. This attempt failed after heavy winds on the day of the hunt altered the camera's view. Tr. 38-39.

[2] Hodnett stated: "We were sitting on top of the bait, because the wave action in the pond had washed it up against the bank where we would be looking to the west, not into the sun. And the wave action had washed the beans and everything up on the bank right where we were sitting for about 50 or 60 yards down each side of the bank." Tr. 78.

other hunters with the ducks.[3] Tr. 24, 27.

Later that evening, the hunters returned to the baited pond and resumed their hunt. Tr. 28. Following the afternoon hunt, the hunters went back to Hodnett's home to clean the ducks. Tr. 28. While there, Hodnett's girlfriend took pictures of the hunters standing on the back deck of Hodnett's home with the ducks visible in the background.[4] Tr. 35. Once informed by Hodnett that the hunters had departed from his residence, Smith went to Hodnett's home to photograph the discarded carcasses. Tr. 30. Pictures introduced at trial showed that seventeen (17) teal, fifteen (15) wood ducks, and three (3) shovelers had been killed during the morning and afternoon hunts. In addition to taking the pictures, Smith bagged the carcasses as evidence. Tr. 37. Smith testified at trial that he later compared the carcasses to the pictures of the twenty-eight (28) ducks he had photographed after the morning hunt and that the carcasses were consistent with the ducks in the photographs. Tr. 38. Before leaving, Smith returned to the scene of the hunt and took pictures of the bait floating in the pond directly below the blind and the discharged shotgun casings lying

---

[3] Smith testified that he did not retain the evidence because he did not want to arouse the suspicion of the other hunters. Tr. 27.

[4] The Government also introduced a recording of the hunters' conversation while cleaning the ducks. Tr. 28-29.

nearby.[5] Tr. 30-31. He also took pictures of the blind where the hunters were stationed. Tr. 30.

At the conclusion of the bench trial, Magistrate Judge Sumner found the Appellants Andy and Ted Elchos guilty of five counts of violating the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. § 703, et. seq. and its attendant regulations. See 50 C.F.R. § 20.21, et seq. Specifically, Judge Sumner found that the Appellants hunted over bait (Count 1), hunted in a closed season (Count 2), exceeded the bag limit (Count 3), exceeded the field limit (Count 4), and exceeded the possession limit for a single day (Count 5). Andy Elchos was sentenced to thirty (30) days in jail, two (2) years probation, no migratory bird hunting while on supervision, and a $3,000 fine. Ted Elchos was sentenced to two (2) years probation and a $3,000 fine. Following their sentences, the Appellants perfected their Appeal, which is now before the Court.[6]

## II. Standard of Review

"Pursuant to Rule 58(g)(2)(D) of the Federal Rules of Criminal Procedure, when reviewing a conviction by a magistrate judge the 'scope of the appeal is the same as in an appeal to the

---

[5] Smith knew the hunters' precise location because he briefly observed the morning hunt. Tr. 24.

[6] Due to coding procedures, the present appeal did not appear as a pending "motion" when the Court ran its usual motions reports, and accordingly, the Defendants' Appeal escaped notice until it was called to our attention by Appellants' counsel. The Court apologizes for any inconvenience this oversight may have caused the Parties.

court of appeals from a judgment entered by a district judge.'" United States v. Jackson, 470 F. Supp. 2d 654, 656 (S.D. Miss. 2007). An appellate court reviews the trial court's evidentiary determinations for abuse of discretion. United States v. Sanders, 343 F.3d 511, 517 (5th. Cir. 2003). (citing United States v. Townsend, 31 F.3d 262, 268 (5th Cir. 1994)). If the reviewing court finds that the trial court has abused its discretion, the court will not reverse if it deems the error to be harmless. Sanders, 343 F.3d at 517.

With regard to the sufficiency of the evidence, the magistrate court's conclusion is subject to the "any substantial evidence" standard. United States v. Morgan, 311 F.3d 611, 613 (5th Cir. 2002) (citing United States v. Ceballos-Torres, 218 F.3d 409, 411 (5th Cir. 2000), amended by 226 F.3d 651 (5th Cir. 2000). "Evidence is sufficient to support a conviction if any rational trier of fact could have found that the evidence established guilt beyond a reasonable doubt." Morgan, 311 F.3d at 613 (Ceballos-Torres, 218 F.3d 409 at 411). The appellate court "examines the evidence as a whole, construing it in the light most favorable to the government." Morgan, 311 F.3d at 613.

### III. Discussion

Appellants allege that the trial court (1) should have granted Andy Elchos's Motion in Limine to exclude certain audio tapes,(2) improperly admitted hearsay into evidence, (3) erred in

5

denying their Motion for Acquittal based on the insufficiency of the evidence, (4) and erred in denying their Motion for Acquittal because no federal agent personally observed any violations of the MBTA. Of these alleged errors, the first two challenge the trial court's evidentiary determinations and are therefore reviewed for abuse of discretion. The allegation that the trial court lacked sufficient evidence to support a conviction is evaluated under the "any substantial evidence" standard.  The Appellants' fourth allegation is a question of law, reviewed de novo, but is plainly without merit and is dismissed without discussion.[7]

*1. Whether the Trial Court Abused Its Discretion in Denying Andy Elchos's Motion in Limine to Exclude Certain Audio Recordings*

"'Admission of tape recordings falls within the 'sound discretion' of the trial court.'" Thompson, 130 F.3d 676, 683 (5th Cir. 1997) (quoting United States v. White, 116 F.3d 903, 920 (D.C. Cir. 1997) (per curiam)). The preeminent requirement for the admissibility of audio recordings is reliability. Thompson, 130 F.3d at 683. The government bears the burden of showing that the recordings are "accurate, authentic, and trustworthy." Id. Once the proper foundation has been laid, the party challenging the

---

[7] The Appellants cite no relevant legal authority for their legal assertion that a federal agent must personally view a violation of the MBTA in order to obtain a conviction under the MBTA. The relevant statutes and regulations contain no such language and the Court finds no case law to support this proposition.

recordings must show that they are inaccurate. Id. (citing United States v. Carbone, 798 F.2d 21, 24 (1st Cir. 1986). A trial court's decision to admit audio tapes over the objection that they are inaudible is reversible "only if the inaudible parts are so substantial as to make the rest more misleading than helpful." Id. (quoting Gorin v. United States, 313 F.2d 641, 652 (1st Cir. 1963)).

Prior to trial, Andy Elchos moved to exclude audio recordings of phone conversations between Andy Elchos and Tim Hodnett,[8] which took place prior to the hunt and shortly after the hunt while Andy Elchos and Tim Hodnett cleaned the ducks. The Appellants argued that the recordings were so unintelligible or inaudible as to render them more misleading than helpful. Magistrate Judge Sumner, noting the objection, determined to allow the recordings into evidence "to the extent they are discernable and may be helpful to the court." Tr. 14. Based on this reasoning, Judge Sumner consistently overruled counsel's objections to every audio recording introduced at trial. Tr. 15, 18, 22, 23, 29, 42, 44. At the conclusion of the Appellants' case, Judge Sumner noted that the audio recordings were "very difficult to understand" but informed the Parties that he would "attempt to listen to them" prior to rendering his verdict. Tr. 156.

In the record before this Court, it is unclear as to what

---

[8] Ted Elchos did not file a motion in limine and did not join in the Motion.

extent the trial court relied on the audio recordings in reaching its verdict. As a result, in their brief, the Appellants have not shown what prejudice they might have suffered as a result of Judge Sumner's decision to allow the audio recordings into evidence; instead, they merely argue that it was error to admit the evidence. Regardless, this Court has reviewed each of the audio recordings. As stated by the trial court, they are indeed very difficult to understand, but the Court finds that some portions of the conversations recorded therein are discernible and could be considered more helpful than misleading.[9] Thompson, 130 F.3d at 683. For example, Government's Exhibit G-13, the most pertinent of the recordings, clearly records that Hodnett told Andy Elchos that he had been baiting the pond prior to the hunt. Therefore, it was not error to rely on them as evidence. Id.

Even if the audio recordings were improperly admitted, the Court finds that such admission was harmless. The audio recordings do little more than provide some context for the uncover operation conducted by Smith. Again, the most relevant information they provide is that Andy Elchos knew in advance of the hunt that the pond was baited. Tr. 17-18. This fact, however, is amply supported by other evidence in the record. See discussion infra. Other than

---

[9] During the phone conversations between Hodnett and Andy Elchos, Hodnett's statements are the more difficult to understand and are, the majority of the time, indecipherable. For the most part, however, it possible to understand what Andy Elchos is saying.

this information, they contain no direct evidence that either Appellant violated any of the statutes and regulations of which they were convicted and therefore the exclusion of the audio recordings would in no way benefit the Appellants' cause.[10]

2. *Whether the Trial Court Erred in Allowing Hearsay Into Evidence*

Next, the Appellants argue that the trial court erred by allowing improper hearsay into evidence. At trial, the court allowed, over the Appellants' objection, Smith to testify regarding what he overheard during a conversation between Tim Hodnett and Mark Necaise. Tr. 10. Federal Rule of Evidence 801 defines hearsay as "a statement . . . offered to prove the truth of the matter asserted." It is apparent that Smith's testimony regarding what Mark Necaise said was not offered to prove the truth of the matter asserted therein, i.e., that Andy Elchos may have engaged in prior illegal hunting activities; rather, it was offered to explain the origin of Mississippi Department of Wildlife's investigation. Therefore, the testimony is not hearsay and the trial court did not err in considering it.

The Appellants further argue that many other of Smith's

---

[10] In this section of their appeal, the Appellants briefly contend that they were prejudiced by the Court's decision to allow Andy Elchos to introduce video evidence of the ponds. Under the doctrine of invited error, the Appellants are prohibited from inviting error and then complaining thereof. See, e.g., United States v. Baytank (Houston), Inc., 934 F.2d 599, 606 (5th Cir. 1991).

statements allowed by the trial court constitute inadmissible hearsay but do not specifically explain how such statements qualify as hearsay.[11] See App. Brief. at pg. 7 (citing Tr. 11-13, 14, 28, 29, 37, 40-50). After reviewing the trial transcript, particularly in the places cited by the Appellants, the Court finds that the trial court did not allow inadmissible hearsay into evidence, and therefore neither abused its discretion nor committed plain error. For instance, Appellants appear to argue that statements such as "I was informed by Tim" or "I received a call from Tim . . . letting me know" presage hearsay. Reading these phrases in context, however, Smith was merely explaining to the court how he was able to move freely about the campsite undetected. See Tr. 28, 29.

Moreover, here again, even if any of Smith's statements could be characterized as hearsay, their admission into evidence was harmless inasmuch as there was substantial evidence before the trial court to support the Appellants' conviction. See Sanders, 343 F.3d at 517. Hodnett personally testified about the hunt, and the trial court relied on photographs and other evidence in finding that the Appellants were guilty of multiple violations of

---

[11] Further, the Appellants' brief does not specify exactly which statements they believe are inadmissable hearsay, but the Court can infer in most instances the statements to which the Appellants refer. In many of these instances, Appellants' trial counsel failed to object at trial and therefore admission of this testimony should be reviewed under a plain error standard. United States v . Fuchs, 467 F.3d 889, 999 (5th Cir. 2006).

the MBTA.[12] Andy Elchos's previous hunting excursions or testimony regarding how Smith escaped the notice of the hunters did not factor into any elements of the crimes for which the Appellants were convicted, and even if it had, the exclusion of this evidence would in no way benefit the Appellants because the evidence as a whole clearly supports their conviction. Morgan, 311 F.3d at 613.

> *3. Whether the Trial Court Erred in Denying the Appellants' Motion for Acquittal Based on the Insufficiency of the Evidence*

Finally, the Appellants argue that the Government did not introduce enough evidence to prove the charges against them beyond a reasonable doubt. Specifically, they claim that the Government never demonstrated that either Appellant knew that the pond had been baited and that the Government never produced reliable evidence that either Appellant exceeded the bag limit. This circuit has held that a conviction for killing migratory birds over bait requires a showing that a hunter knew or reasonably should have known that he was hunting over a baited area. Id. at

---

[12] In their argument regarding hearsay, the Appellants state that "Ironically, the Court even allowed photos into evidence, allegedly take two (2) or three (3) years earlier!! All of this was error." App. Brief. at pg. 7. The Appellants refer to the pictures taken by Hodnett's girlfriend following the hunt. To the extent that the Appellants are objecting to the admission of these pictures into evidence, the Court finds this argument without merit. Smith testified that he received the film from Hodnett immediately following the conclusion of the hunt and had the photos developed thereafter. At trial, he connected scenes from the photographs to scenes that he had personally witnessed upon arriving at Hodnett's house after the hunters had left.

614 (citing United States v. Delahoussaye, 573 F.2d 910, 912 (5th Cir. 1978) . All of the Appellants' other violations of the MBTA are strict liability offenses. Morgan, 311 F.3d at 615-616.

In their brief, the Appellants suggest that Smith may not have known on which pond they were hunting because there were seven (7) ponds on Hodnett's property.[13] See App. Brief at 9-10. There is no merit to this assertion. Working closely with Hodnett, Smith documented the presence of soybeans at the exact location where the hunters were positioned. Tr. 19, 30-31, 56. Further, Hodnett testified that during the hunt soybeans had washed up along the bank directly below where the hunters were standing. Tr. 78. According to Hodnett, "it was very clear that they were baited." Tr. 93. There is no question that substantial evidence was presented at trial for a rational trier of fact to conclude that the Appellants had knowledge that they were hunting over a baited pond in violation of 50 C.F.R. § 20.21(i). See Ceballos-Torres, 218 F.3d 409 at 411.

As to the Appellants' final claim, the Court finds that substantial evidence supports the trial court's determination that the Appellants exceeded the daily bag limit, which at the time was four teal per person. See tr. 27; 50 C.F.R. § 20.24. Appellants

---

[13] The Appellants contend that the fact that Smith's video surveillance equipment failed to record any activity is evidence that Smith was monitoring the wrong pond. At trial, Smith explained why his surveillance equipment failed to capture the hunt. Tr. 38-39.

12

advance the argument that it is impossible to know "who shot what and/or how many." App. Brief at 10; see generally, United States v. Clucas, 50 F. Supp. 609 (D.C. Va. 1943). At trial, Hodnett testified to the number of ducks he and his son killed, which amounted to seven teal. Hodnett stated that Andy and Ted Elchos killed the remaining ducks, including all the ducks that were not in season. Tr. 77. When asked if Andy Elchos and Ted Elchos killed more than the limit of teal, Hodnett responded, "Yes." Tr. 77-78. The trial judge, as the finder of fact in a bench trial, is in the best position to judge the credibility of the witnesses. See French v. Allstate Indem. Co., 637 F.3d 571, 580 (5th Cir. 2011). In this case, there was credible testimony, supported by other evidence, that each Appellant killed ducks exceeding the daily bag limit, and therefore, there is no merit to this final assertion.

For the foregoing reasons,

The Court **AFFIRMS** the judgment of the trial court.

    /s/ David Bramlette

**UNITED STATES DISTRICT JUDGE**